8th Circuit. Hear ye, hear ye, hear ye. United States Court of Appeals for the 8th Circuit is now in session. All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. Good morning everyone. Welcome to this morning's hearings before the 8th Circuit Court of Appeals. We are in remote locations and we are fortunate to have the technology that we do to continue our hearings in inclement weather and through a pandemic. And so we are fortunate that we can avail ourselves of these tools and continue to focus on hearing and deciding cases. And so we thank each of you counsel who have made it possible to participate in the forum that we have made available. So with that, we'll begin with the first case. Madam Clerk, would you call the first case for the morning? First case for argument this morning, case number 20-1894, Western Missouri, Brad Jennings versus Daniel Nash et al. Ms. Ramsey? Yes, Your Honor. My name is Liz Ramsey. I represent appellant Brad Jennings. Jennings appeals from the denial of his motion for new trial and grants of summary judgment in his 1983 claim. Appellant's constitutional rights were violated as a result of his wrongful conviction for the death of his wife, Lisa Jennings. Count one against Appellant Nash, suppression of the exculpatory gunshot residue test Jennings was wearing the night his wife died, went to trial in February 2020. I will first discuss three specific evidentiary rulings in addition to those cited in our brief, which constituted reversible error. First is the admission of Prosecutor Selner's opinion testimony that he had probable cause to charge Jennings with murder. The second is the refusal to instruct the jury to disregard the unfounded opinion testimony of Prosecutor Selner that the death of Lisa Jennings was a murder. The third being the repeated and improper questioning of Jennings' damages expert as to whether his post-traumatic stress disorder could have been caused by overwhelming guilt for having killed his wife. This court reviews the district court's evidentiary rulings for an abuse of discretion. The question then turns to whether the error was harmless. And the error is harmless if it did not have a substantial influence on the jury's verdict. First, I'd like to discuss what happened in the district court generally. The applicable legal standards that show reversible error here are set forth in this court's decisions in White v. McKinley and Valadez v. Watkins. White holds that in a case like this, evidence tending to show innocence is admissible if it is probative to other issues in the case. And that evidence of guilt irrelevant to issues in the case cannot come in while weighing the probative value versus the prejudicial effect. But that's not what the district court did here. The district court ruled that Jennings had opened the door generally to a discussion of probable cause and guilt, opening the floodgates into discussions of irrelevant and highly prejudicial evidence. This is completely contrary to the highly limited doctrine of door opening set forth in Valadez for two reasons. First, under Valadez, you can't open the door to inadmissible evidence by using admissible evidence. Here, the district court erroneously ruled that inadmissible evidence of guilt and Nash's probable cause was opened. That that issue was opened by plaintiffs introducing evidence of materiality and bad faith. Well, counsel didn't didn't wasn't there a warning? I think it was in a pretrial order that said, you know, if you if you try to litigate guilt here, Brad tries to litigate the guilt from the underlying trial. Then I'm going to allow the government to bring in some of this evidence of its own to rebut that. Am I wrong about that? You are not wrong, Your Honor. There was an order before the trial that said that. However, that order was contrary to the principles in Valadez, which said that opening the door is not a general proposition, that we have to look at each piece of evidence, weigh the probative versus the prejudicial value. And it's not an excuse under Valadez to open the floodgates to prejudice. The rebuttal evidence offered to cure the error must be commensurate with the magnitude of the error itself. Second, counsel, excuse me, counsel, what is the standard of review here on this question? This would be what each evidence you're ruling. It would be abuse of discretion. And then what error was harmless? Yes, Your Honor. And that's kind of a steep hill to climb, isn't it? Usually abuse of discretion. Yes, Your Honor. However, I believe that we have gone up that hill because I believe that the district court did an inadequate analysis here and did not follow the principles of opening the door. But the second point I'd like to make is that Jennings did not open the door because Jennings never argued there was a lack of probable cause. What was argued were issues relevant to materiality and bad faith. Actually, the words probable cause or lack of probable cause were never used. However, it was a general proposition that the district court opened up. They didn't do the proper analysis. They made a blanket ruling and even allowed the defense to make foundationless accusations of murder. The first ruling specifically that I'd like to talk about that violated these principles in White and Valadez was when Prosecutor Zellner gave opinion testimony that he had sufficient probable cause to charge Jennings. First, this was not relevant. Probable cause was not an issue in this case. And Jennings never argued there was a lack of probable cause. Second, the error was not harmless because it likely had a substantial impact on the jury because of the weight that a prosecutor's testimony is given by a jury. This is contrary to White because the court did not weigh the probative value versus the prejudicial effect. Instead, and contrary to Valadez, the court opened this opinion testimony under a blanket open the door theory that does not apply here. The evidence admitted that tended to show innocence was relevant to materiality. Thus, door opening didn't apply. Moreover, under Valadez, opinion testimony from the prosecutor was a wholly disproportionate way to rebut evidence of innocence because the prosecutor's influence opinion has undue influence. Can I ask you a question? Back you up a second. So you made the claim just a couple of minutes ago that the words probable cause never came out of, you know, trial. Brad's mouth, counsel's mouth. But my understanding is the whole theory behind, or at least a lot of the evidence that was presented was that there wasn't enough evidence to charge him. And I wonder if that's just a distinction without a difference. I mean, yes, the words probable cause may not have been used, but essentially that was what you were arguing. Am I wrong about that? I believe you are, Your Honor. I would respectfully disagree in saying that the evidence that would put on, though some of it did tend to show innocence, it was to the materiality of the gunshot residue test, what it meant in the totality of the circumstances and why it mattered. So when you looked at one example that was given was when in opening statement, counsel for Jennings said that the gunshot residue test showed that the death was more likely a suicide. Well, that's exactly the materiality of that suppressed test. That's why it was so important. And that is an element in a 1983 Brady claim. So the theory was not that there was not enough evidence to charge him. Like I said, probable cause was not talked about. It was simply evidence that tended to show innocence, but really went to materiality and bad faith. So the bloodstain evidence that came in was to show Nash's bad faith in his analysis, his lack of training, his lack of education and studies that he should have known about. So that went to his bad faith in his investigation. So when the other side comes back and says there's plenty of evidence, other evidence to rebut that testimony, why aren't they talking about materiality, too? Well, first of all, your honor, the way they did it was not proportionate. OK, so they did not. Prosecutors opinion testimony about sufficient probable cause is not admissible evidence. And it's not evidence in the record. That is inadmissible. Opinion testimony from a prosecutor. This is not to object. Yes, your honor. We did. This was not the only error made by the court during the testimony of Zellner. And these errors compounded on each other. So Zellner Jennings expressed before prosecutor Zellner came on that he had concerns that Zellner would get on the stand and call the death of Lisa Jennings a murder. Everyone in this case, this is Judge Smith, didn't the plaintiff essentially do the same thing by attempting to call it a suicide? No, your honor. Saying it was a suicide. First of all, like I said, that went to the materiality. That is what is on Lisa Jennings death certificate. And they can't prove otherwise. So there is a foundation issue here. OK, there is a foundation issue where they cannot prove that a homicide or a crime was even committed. The only thing they had to show a homicide or discredit later discredited bloodstained opinions. OK, once those were discredited, they couldn't even prove a crime occurred, which is why they dropped the charges. So for them to be able to bring in faceless accusations of murder, especially through opinion testimony by the prosecutor, was highly prejudicial and not relevant and certainly not proportional to rebutting specific issues. That's what Valdez tells us, is that you can't open the floodgates of something general. It is a and White says the same thing. It is a piece by piece analysis. And so a prosecutor's opinion testimony is not relevant or proper. And to go on during his testimony, he called the death and murder after he we had explicitly had an agreement with the court and the other side that he would not be able to give that type of opinion and would not be able to refer to the death that way. Within minutes of him getting on the stand, he did. And counsel, can you outline for me exactly why and to what extent you think this evidence was harmful to you? Yes, your honor. Here, the power, the Fifth Circuit and this court have recognized that the power and force of the government tend to impart an implicit stamp of believability on what the prosecutor says. It is highly prejudicial to have a baseless and foundationless accusation of murder, especially where a homicide cannot be proved. But here, a prosecutor's opinion testimony is extremely harmful. And to go on, you know, he was allowed to testify to probable cause materiality of the suppressed evidence. And the jury heard Jennings request a specific and explicit instruction to disregard the reference to murder. And that instruction was refused. Therefore, when they heard an explicit instruction that was refused, that raised the possibility in their minds that they could consider it right after the exchange. The court compounded that harm, the harmful nature of the term murder by later in Zellner's testimony, referring to him as an able prosecutor in front of the jury. The error in refusing to instruct the jury to disregard that statement was not harmless, and his opinion testimony very likely had undue influence on the jury. The next thing that the court did that was reversible error was allow repeated and improper questioning of Jennings damages expert as to whether his PTSD could have been caused by overwhelming guilt for having killed his wife. He was allowed to ask Dr. Weaver six times and over the repeated objections of appellant's counsel, whether appellant's PTSD could have been caused by overwhelming guilt for having killed his wife. This prejudicial, the prejudicial and incredibly harmful nature of this questioning was displayed clearly when Dr. Weaver was asked the same question a seventh time by a juror. The court allowed this line of questioning that should have been prohibited under Valadez. The evidence was not relevant because Dr. Weaver was assessing the psychological impact of Jennings incarceration. A Brady violation had already been determined to have occurred by the Missouri courts, and therefore his incarceration was found to be wrongful and his convictions thrown out. Her assessments and findings had nothing to do with innocence or guilt, but the impact of his wrongful or unconstitutional incarceration. Their questions about overwhelming guilt did nothing to rebut the assessment or the presumptions underlying it. I have a note here and we're talking about a lot of different evidentiary rulings, which is why I want to give you a chance to respond on this particular issue. I have a note here that says this one is on plain air review, at least parts of it, because there was no objection. So I want to give you a chance to respond and let me know whether there was an objection stated or not. Are you referring to Dr. Weaver's testimony? Dr. Weaver? Yeah. Oh, no. There were several objections made out in front of the jury and not what I can actually give you the exact transcript sites where that happens. Let me pull that up for you right now, Your Honor, because we objected several times and had a. Yes, we objected that it was not relevant to her analysis, and that was around transcript page 127. The objection was renewed and overruled on transcript page 131. And at that point, I objected to the entire line of questioning and the judge allowed it to continue. But there were at least two objections made. OK, thank you. Thank you, Your Honor. The only testimony that was elicited on direct examination of Dr. Weaver regarding the night Lisa Jennings died was background information that was given to Dr. Weaver during her assessment of Jennings. It did not factor into her analysis. She made it clear at several points that her analysis was focused on Jennings psychological function, not a fact finding comparison. Therefore, under Valadez, there was no information elicited on direct examination that opened the door to rebuttal with accusations of murder. Even if there was confusion about the role this background information played in her analysis, the issue was already cleared up by counsel for Nash at two different points where he pointed out that the narrative in a sentencing assessment from the underlying trial that she had reviewed. Differed from Jennings account of the facts to her, she clarified both times when she was asked that her focus was to look at the psychological impact of his incarceration and the background information did not factor into that. And even if they were allowed to rebut background and background interview that Jennings gave to Weaver, this case is analogous to Valadez, where the court found that the questions went too far beyond remedying the implication. OK, the issue of the role the background played in her analysis or that the state had disputed Jennings version of events was cleared up by counsel for Nash. Counsel for Nash all but admitted in the transcript that his questioning had gone beyond rebuttal and beyond any point to which the door may have been opened on page 127 of the transcript. He said, I think I can explore whether or not he is having feelings of guilt for actually doing the crime. That was Ramsey. Miss Ramsey, I don't know if you can notice your clock, but you're you're within your rebuttal time. I continue, if you like, or you can reserve it. I appreciate it, your honor. I will reserve the rest of my time for rebuttal. Thank you. All right. As I understand, I have a breakout indicating there are three attorneys that wish to speak for the police. All right. So we have two minutes for Miss Ramsey's two minutes for this nose or for excuse me, for Miss Pennycuff five minutes for Mr. Baird and 13 minutes for Mr. James. Is that accurate? That's correct, your honor. All right. Miss Pennycuff. You're muted. Good morning. May it please the court. I apologize. My name is Lenny Pennycuff. I represent appellee George Knowles, who was granted summary judgment on the issue of qualified immunity on Jennings claims for failure to supervise Daniel Nash, who was the officer who investigated the death of Lisa Jennings as the appellate and made no argument on this issue during her opening this morning. Nor was there any argument on this issue involving Knowles and her reply brief. We'd like to stand on the arguments in our brief and request that the decision to grant summary judgment to Knowles on qualified immunity grounds be affirmed. And unless there are any questions that will complete my argument. I don't see any. Thank you, Miss Pennycuff. Mr. Baird. Yes, your honor. May it please the court. My name is Patrick Baird and I represent former Sheriff James Rackley as well as Dallas County, Missouri. Specifically, I am here to argue that the court properly granted summary judgment on behalf of Mr. Rackley on count one, count three, and on behalf of Dallas County on count five. I did not hear any argument regarding the granting of summary judgment from appellate counsel. And so therefore, I would like to ask if there are any questions and if not, I will yield my time to Mr. James, who actually conducted the trial on behalf of the defendant, Nash. I see no questions from my colleagues and I have none. Therefore, we'll move on to Mr. James. Thank you, your honor. May it please the court. My name is Daniel James and the assistant attorney general represented Pelley Daniel Nash through summary judgment and through the trial. Our position in this case, your honor, is clear. District Court gave substantial consideration to the decisions in this case. And we believe the rulings are absolutely correct and consistent with the law. Our concern in this case, your honor, is that this case is come up in light of white versus McKinley as appellant's counsel referenced. In that case, your honor, the court made it very clear that issues concerning guilt or innocence are not relevant in this case. However, this case is markedly different because the appellant in this case made that issue, the guilt of him in the underlying criminal trial, the central tenant of their case. That's exactly what Judge Epps found in the motion for new trial and his order denying that. And that is exactly what the evidence is. Furthermore, your honor, plaintiff even references the fact that they proved that they were proved that defendant was innocent of the crime of murder that appears in their motion for new trial on page eight. The document references A2421 on page eight, which is 2428 paragraph 25, and I will quote, plaintiff clearly and concisely proved that he was innocent. None of the issues of whether he was innocent or not were relevant to this particular case. The issues in this case, according to the instructions given to the jury, were confined strictly to whether or not the gunshot residue test was not given to the prosecutor, whether it was bad faith, and whether that injured the plaintiff or the appellant in this case. However, as the court had mentioned before, the district court warned plaintiff's counsel, if you basically, if you go down that road and prove or put on evidence that there was no probable cause or lack of probable cause or do anything other than, and the court says merely state he is innocent of murdering his wife or his convictions were vacated. And the plaintiff and the appellant went far beyond that in this case. Their opening statement, Lisa Jennings committed suicide. And that wasn't the only comment in the opening statement. They brought in a blood expert to testify that the blood evidence showed that he was not guilty of murder. And that's even also referenced in paragraph 25 of their motion for new trial, where it says the uncontradicted testimony of Joe Slemko was the absence of a void pattern on the carpet where plaintiff would have been stating 100% proved that no one was there when the shot was fired. The plaintiff made their case strictly about whether or not he was guilty. Defense was allowed to rebut that evidence, and we brought in rebuttal evidence. We were also limited on things that we were able to do. For example, Prosecutor Zellner testified that there was a showered before the police arrived. The judge later looked at it and found that there was no evidence in the record trial transcripts of showering and instructed the jury later the next day that to disregard that comment. Because of that, I want to ask you, how could I mean, it's just so weird case and the types of claims that were being alleged. I mean, how do they prove materiality if they don't talk about the other evidence in the case? I mean, that's one of the problems I'm having. And so, yes, I realize that you have a chance to rebut it, but I'm just trying to figure out how you prove materiality of the evidence that that was not disclosed. The evidence, the evidence, the gunshot residue evidence materiality is important to this case. They presented evidence of their gunshot residue expert, and he testified concerning what his opinion was. Nick Gerhart, who is the actual criminals for the highway patrol, who did the testing, also testified that in his opinion that it doesn't tell you as much as you think. So that those issues materiality were correct, but the blood evidence had absolutely no bearing on the gunshot residue evidence. Not at all. And yet the plaintiff insisted on putting that evidence in trial to show he was innocent. They made it a point of their case to prove he's innocent. So, again, it's not a matter of whether or not the blood evidence, whether it's material or not, is not relevant for this case with these particular facts on this claim. If there was evidence about blood pattern analysis being fraudulent or improper, things like that, the materiality of that would be relevant. But those are not. The plaintiff added to the case to make their case a lot stronger, including a substantial amount of evidence, which some of it did not pan out the way they anticipated, to try to show Trooper Nash's bad faith or propensity to write false reports. In regards to, I want to jump to Dr. Weaver for a moment if the court doesn't have any other questions about that. Dr. Weaver's testimony was supposed to be an independent evaluation, and that's what she testified that she was going to be giving, an independent evaluation to determine his psychological damage of his incarceration. However, Dr. Weaver showed her bias at the very beginning of this case, very beginning of her testimony, when she started talking about how he was wrongfully arrested, convicted, and incarcerated. It wasn't just a wrongful incarceration. That would have been acceptable, would have tied our hands to simply talking about incarceration and the evidence that was left out. But when she was asked, what do you mean when you say wrongful arrest, conviction, and prosecution, her testimony was, well, he was incarcerated and arrested and charged with a crime he didn't commit. So I call that a wrongful arrest. Well, if he didn't commit the crime, then there's no probable cause. There's no probable cause that we are allowed to get into rebuttal evidence of probable cause. And that's exactly where we went. Prosecutor Zellner never testified that the defendant was guilty of murder, never testified that anything like that. What he did testify was there was probable cause to charge him. And, in fact, there was a probable cause determination in this case, and probable cause was found, which is why the district judge of summary judgment granted the issue of probable cause in the malicious prosecution claims. There was probable cause to find that he committed the crime to be held for trial under Missouri law. That was established fact by the trial court on the district court in the summary judgment motion. Plaintiff wanted to go back and argue probable cause again, even so far as to ask the plaintiff directly on examination, did you kill your wife? Whether he killed his wife or not is not relevant, but the jury cannot be inundated with evidence that he didn't commit a crime and still be allowed to keep out rebuttal evidence that he did. But, again, any error like that, we believe, was also cured in closing arguments when it was stated that the issues concerning whether he's guilty or not of the underlying crime are irrelevant to this case. The instructions require you to find, and instruction 18 is what was went through at that point. And none of that had any bearing on the issue. The trial court correctly found that the plaintiff, or the appellant, did not address any issues concerning the policies of the highway patrol that was put on as evidence by the defense that it is not a trooper's duty with the patrol to send out lab reports. And the evidence to show that the lab report was lost somewhere between criminalist Nick Gerhardt faxing an uncertified copy to the troop headquarters at Troop D in Springfield. And the fact that he put it in the box to be mailed out, which is required, as the evidence showed, for it to be certified by a clerk and two copies, certified copies, mailed out. We know for a fact, and there's no evidence to dispute this, that no certified copy was ever found, including the Patrol Records Division, where the clerk of the troop is supposed to mail one copy to, and the prosecutor. The only one that was found was an uncertified copy that was in a lieutenant's file at the patrol. Now, the question readily there was it wasn't turned over. That's not an issue in this case. But the question comes up whether or not Sergeant Nash intentionally withheld that or in bad faith withheld that report. And by the defense showing clearly that the patrol, not him, not just a supervisor, the Highway Patrol designates whose duty it is to send out that lab report and takes that away from the prosecutor, from the officer, as Trooper Nash testified, to eliminate the same exact facts that's being alleged here. If there was the other way around where the trooper was required to do it, he can get the mail, look at it, see two lab reports, it says something that is not helpful to his case, or he believes is not helpful, and just throw it in a trash can and say, I never got it. But the only way they can show that Trooper Nash knew about this is by Nick Careheart. And Nick Careheart was able to say that he doesn't recall telling him the results on the phone. He just remembers that he mailed it out, or excuse me, faxed it out and put it in the basket to be mailed out. Those are the facts of the case that were unrefuted. Now, at that point, clearly the jury can find that there was no bad faith on his part. We know it wasn't turned over. Materiality at that point is irrelevant, whether it's material or not. It could be the most material thing in the world, but if there's no bad faith, which is the other part of what they have to prove, there's no case. So the plaintiff or the appellant focused their case mainly on whether or not he committed this crime by bringing in a computer expert to talk about tampered files, which allegedly didn't have it had nothing to do with gunshot residue test. And yet they were allowed to do that, even though they had been warned. And their cross-examination of that witness showed that instead of using the word tampering, such as altering or changing to make him fraudulent, they were accessed by a trooper without using proper equipment. Now, does that have anything to do with bad faith on the trooper's part? No. But the bottom line is this is the evidence they put in. They went out of their way to make, as Judge Epps said, the innocence of the plaintiff the central tenet of their case. This case could have been tried as a five-day trial. This case could have been tried in about two and a half days if the facts were stuck to materiality of the gunshot residue test, expert testimony concerning that, and testimony concerning the trooper's credibility in this case. But rather than do that, the appellant went out of their way, again, as they say to their motion for new trial, clearly and conclusively proved he was innocent. Judge Epps is absolutely right in his decision that for when they opened the door and continue to open the door throughout the case, that rebuttal evidence was proper. Again, still limiting us to rebuttal evidence. Prosecutor Zeller was only allowed to talk about what he does, what he did in this case, and that he would not have hinged this case on a gunshot residue test. That's materiality. That would be appropriate testimony. The cases cited by appellant in their briefs for prosecutorial comments not being allowed are all criminal cases. Criminal prosecutors are not allowed to give their personal opinions on whether or not a person is guilty or not, not allowed to give their personal opinions on the evidence. They're allowed to give reasonable arguments about the evidence and what those conclusions may be, but they're not allowed to say, I believe that this guy killed it because I'm the prosecutor. You should believe me. That is not allowed. It's clearly not allowed. But that's not what happened because this is not a criminal trial, although as much as appellant wanted to make it a criminal trial, they did not. It was not. It was a 1983 action for failing to disclose a gunshot residue test and alleged bad faith on the part of the trooper. With regard to Kevin Zellner using the word murder, appellant says they asked for and did not receive a cautionary instruction. In fact, they objected, asked for a cautionary instruction, and Judge Epps gave them one by telling the jury that the plaintiff or the appellant in this case is presumed innocent as previously mentioned. There was no further objection to that cautionary instruction. So that, of course, makes everything plain error at that point. They did not object to what was given. They asked for a cautionary instruction. They didn't ask for a specific one. They didn't say we want the court to just tell them to disregard this. The court gave an instruction and they accepted that. And at that point, no further objection. That becomes a plain error situation, and Judge Epps said in his motion for new trial that plain error was not met. With regard just briefly to the summary judgment motions, Judge Lowry, who heard the case from summary judgment, made specific findings of the two issues that are being challenged here are the Rice-Maddox material, which Judge Lowry broke up into two different segments. The first one was the initial report of the interview with Bridget Maddox by Trooper Nash and Trooper Crane, which was disclosed to the defense prior to trial. So therefore, Judge Lowry's finding was that was not a Brady violation. So therefore, no 1983 action could be maintained for allegedly failing to disclose that evidence. Further, the appellate wants to argue continuously that these are fraudulent documents. These are false documents. The only person who ever testified that they're false is Bridget Maddox. She never testified at trial. So there's been no findings that these documents were false prior to this trial. And in fact, she testified in this trial and her testimony was challenged on those issues. Again, another issue trying to deal with with the does deal with the materiality of the gunshot residue test on the conspiracy charge. Judge Lowry properly found that even though the personnel file, which included a memo from Trooper Nash to Sheriff Franklin, was not disclosed, that that issue was too tangential to an impeachment of the investigation. And she went through the U.S. versus Conroy analysis and made very specific findings that too many ifs in this case. If the trial court would have allowed Sergeant Nash to be cross-examined about this, if the court would allow additional evidence outside of the criminal case to prove that, and if the jury based a decision based upon it, too many ifs, as Judge Lowry said, is not enough to warrant a case for conspiracy as well as to be used as impeachment evidence or make it a Brady violation. Those are the issues, Your Honor, that we think are very important. We believe that this case, the court can reconcile this decision with White versus McKinley because of the fact that in this case, the plaintiff was cautioned and not just talked about issues that were material to the Brady claim of the gunshot residue, but went far afield to put on blood spatter evidence experts, to put on computer experts, things of that nature, showing the defendant had a wonderful relationship with his wife, which at the time that the photographs that were shown to them, the evidence showed that she was having an affair with another man. And the fact that the plaintiff, the appellant testified in this case and got up and said he didn't do it and portrayed himself as having a wonderful marriage, put him subject to cross-examination and impeachment from prior statements. Based upon this, Your Honors, we believe the district court made extensive efforts to follow the law in this case and made a correct decision. We ask the court to affirm the ruling of the motion summary judgment and affirm the verdict in this case. Thank you. Thank you, Mr. James. Ms. Ramsey, your rebuttal? Yes, Your Honor, briefly. May it please the court. First of all, I would like to say that evidence of innocence can come in where it is relevant to other elements in the prima facie case, materiality and bad faith. That is clear from White v. McKinley, where she allowed evidence of innocence in. They admitted here two different ways that they could not prove a homicide, including at the trial on page 622 of the transcript. They admitted that they could not prove a homicide. There is a foundation issue. And as far as Prosecutor Zellner's opinion testimony, the cases that cite that the prosecutor's opinion has an implicit stamp of believability are criminal cases. But that is still a jury, and he still has the power of the state, and he still has that implicit stamp of believability. His opinion testimony, regardless of whether it was proper rebuttal, which I do not agree it was, was not admissible. And he was not disclosed as an expert. The evidence that Jennings presented went to materiality and bad faith. And materiality has to be proven through the totality of the circumstances and how it affected the underlying trial, how it would have affected that trial. You can't talk about an isolated test. You have to talk about it within the totality of the circumstances. As far as Dr. Weaver, she clarified when she was asked about wrongful arrest. And by the way, when she said that she thought wrongful arrest meant he did something he didn't do, that was elicited by Mr. James, counsel for Nash. That was not elicited on direct examination. And he cleared that up when she said several points that she was not using the term wrongful arrest or wrongful conviction in a legal sense, and that it did not play into her analysis. What played into her analysis was the effect of his incarceration, not how he got there. And that was clarified several times before the overwhelming guilt questions began. And Mr. Jennings was asked, did you kill your wife after the Weaver testimony, after that had been allowed. So under Valadez, that would have been proper rebuttal and properly admitted evidence to rebut what had happened with Dr. Weaver over the repeated objections of appellant's counsel. Further, as far as Mr. Zellner, there was no cautionary instruction given. It was not a present instruction. If you look at the exchange in the transcript, what was said was when counsel for Jennings specifically requested that they be instructed to disregard, the response was the jury has been previously instructed that Mr. Jennings is presumed innocent. That instruction that was requested by appellant was refused. Therefore, that was not reviewed under plain error, and it is a mischaracterization to say that the district court reviewed it under plain error. It is not clear from the order denying the motion for new trial on that specific issue whether it was being reviewed under plain error. And actually, he says in other places specifically that he is reviewing things for plain error and does not say that about that request for a cautionary instruction. As far as the summary judgment issues, we believe that those issues have been properly and thoroughly briefed. The one thing I would like to clarify is that Mr. James said that Bridget Maddox had not testified to anything until this trial. That is inaccurate. She testified at Mr. Jennings' habeas corpus proceedings almost immediately after these materials that were suppressed by Nash and Rackley were first given to Brad Jennings. So in sum, I would like to ask this court to reverse the denial of the motion for new trial and the grants of summary judgment on the claims that are being appealed. We believe that a grave injustice has occurred here. Thank you, your honors. I appreciate your time. Thank you, Ms. Ramsey. Thank you also to counsel for the appellees. We appreciate the argument which you have provided to the court this morning and the briefing that has been submitted will take the case under advisement. Counsel in the first case may be excused. Thank you.